Before we get started, Mr. Feeweger, did you want to take your five-minute rebuttal on your cross-appeal? Yes. You do? Okay. Pardon? I may not use that full-time. All right. But you would like to have it. We didn't ask, so we thought we'd better. Mr. Martin? Good morning. Good morning. May it please the Court, Mr. Feeweger, my name is Steve Martin and I represent the appellant cross-appellee Trissel, Graham & Toole in this matter. Trissel, Graham & Toole is before you today after a jury verdict on two grounds. First is a review of the trial court's decision to consider an affidavit prior to trial in ruling out summary judgment as new evidence on a motion to reconsider and granting that motion to reconsider, taking away my summary judgment. The other is a review of the denial of my post-trial motion for a judgment notwithstanding the verdict. Specifically on that, there are two issues, its full approximate cause and a lack of duty on the offender. Chronologically I'd like to start with the decision to consider the affidavit on the trial court's decision to reconsider. A little procedural background. In September of 2007, Trissel, Graham & Toole brought a motion for summary judgment. Plaintiff filed a response, the judge ruled approximately a year later in October of 2008 and denied that motion for summary judgment. I came back in on a motion to reconsider that because the trial judge had not considered what had occurred after the closing date. This case involves insurance on a piece of property in Rock Island that the plaintiff claims did not have insurance to the extent that they wanted it. And there were events that occurred after the closing date, which had been the crux of the timing issue, that the trial judge had not considered. So when I brought this motion to reconsider, I wanted the judge to focus on the time period after the closing date. In fact, then plaintiff filed a response and the trial judge granted my motion for reconsideration in order to call it a new motion for summary judgment in favor of Trissel, Graham & Toole. What's important to point out that in both of my motions for summary judgment, when plaintiff filed their motion in resistance or response, they brought up the fact that the plaintiff, Villa, had delivered an appraisal to Trissel, Graham & Toole after the closing as evidence that there was something more that we were supposed to do. That was brought up in their response in October of 2007 and the response in December of 2008. When the trial judge granted my motion for summary judgment, or the motion for reconsideration, she specifically found that the plaintiff had a gap in their evidence, that the plaintiff's principal had testified that he assumed that it had been delivered to me, that his assistant, Ms. Lita Langfield, had delivered it to my client. But he had no proof. They had no proof when I filed the first motion for summary judgment. They had no proof when I filed the second motion for summary judgment. In fact, the judge said there was no proof of it, which is why I got summary judgment. Three weeks after that motion for reconsideration was granted in favor of Trissel, Graham & Toole, the plaintiff appeared with the affidavit of Ms. Lita Langfield saying, I did deliver it. Well, the trial judge abused her discretion in allowing this new affidavit to be considered. Clearly, from the time even prior to the motion for summary judgment, when Lita Langfield's boss, her principal, Mr. Ailes, testified in his deposition in June, June 17th of 2007, he testified, I assume she delivered it. And then they asserted it in both of their response briefs to my motion for summary judgment that it had been delivered. It was clearly an issue, clearly that the plaintiff, Villa, knew that this was something they were going to have to show, and they didn't show it. And then when the trial judge decided to consider this, she took a bold-faced assertion by plaintiff's counsel, I looked for her and couldn't find her. That was it. There was no explanation, there was no questioning as to why. The trial court abused this by allowing it in as new evidence. Lita Langfield had been a former employee of the plaintiff's holding company, which was Signature, which was the principal for Villa. She had left, but in her affidavit, she said, I was permanently living in Des Moines, Iowa as of July 11th, 2007, before I had filed my motion for summary judgment. So she was there in October of 2007 when plaintiffs filed their response to my first motion, in December of 2008 when they filed my second motion for summary judgment,  At all times, Villa knew that they were going to require this testimony to prove their case. But it wasn't until after I got summary judgment, three weeks later, that they were miraculously able to find this person and get this testimony. Plaintiffs needed to show to the trial court, the trial court needed to make a finding that this was new evidence that was either not discoverable at the time that the judge ruled on the motion for summary judgment, or was otherwise unobtainable. Well, clearly it was discoverable. There was an email on January 4th, 2005, between the principal, Mr. Ailes, copying his secretary, this affidavit, Lita Langfield, I'll have her deliver it. They knew that she would be the one. All you had to do was ask her, did you or didn't you deliver it? So clearly that information was discoverable. So then they needed to show that it was unobtainable. And all the plaintiffs did was say, I looked for her and couldn't find her. I looked for her around this courtroom and I can't find her. Is she unobtainable today? No. They didn't provide even any facts to substantiate that it was unavailable. The trial court is not just encouraged but required to not consider these late-filed factual information that clearly could have been discovered prior to a dispositive motion. And this court should enforce that requirement not to consider late, tender evidentiary material that should have been provided at the time of the hearing. The trial court abused its discretion when it failed to require a valid explanation as to why Lita Langfield's testimony was unobtainable other than I looked for her. The trial judge required no facts, made no inquiry, and made no findings as to why she was unobtainable. The order simply said, I find that it was reasonable. Plaintiff's motion for reconsideration, after my motion was granted, never should have been heard, never should have been considered, never should have been argued substantively, especially considering Lita Langfield's affidavit. And this court should then reinstate my motion for summary judgment. Next, I'll address the denial by the trial court of Crystal Graham and Toole's motion for a judgment notwithstanding the verdict. This court should take the standard of review in this case, a de novo review of that decision. The trial court in this case erred when it failed to grant Crystal Graham and Toole a judgment notwithstanding the verdict. When you view the evidence, as you have to, in the light most favorable to Villa, it still overwhelmingly favors Crystal Graham and Toole. Why? Because the plaintiff was the sole proximate cause of their injury, and the plaintiff failed to prove that its loss was due to a breach of Crystal Graham and Toole's duty. The plaintiff in this case is Villa. There are multiple players, but the plaintiff is Villa. It's not the principal Chris Sayles, it's not the controller Conrad Henkel, and it's not the risk manager Bill Bean. They are all the agents of Villa, but Villa is the plaintiff. And the trial judge made it very clear in this case, very early on, that the knowledge of the corporate agents is the knowledge of the corporation. It's clear in this case that at all times Villa, the entity, knew that the Hartford policy did not provide coverage for the existing buildings. It's clear. Bill Bean knew it when he was working there, and Conrad Henkel knew it when he was working there. Now there is, and again I want to view this in the light most favorable to Villa. Villa argued that there was an agreement, and Dan Kern from Crystal Graham and Toole testified, we had an agreement that we were not going to insure the existing buildings until we could get the proper underwriting information in order to give the insurance market to do it. That was my client saying there was an agreement. That agreement was a conversation he had with Bill Bean. Bill Bean is Villa. Dan Kern is Crystal. So there was an agreement between Crystal Graham and Toole and Villa, that they weren't going to insure the existing buildings until they could get the proper underwriting information to take it to the market. So there was that agreement. Villa knew of that agreement. Villa knew it didn't have coverage. Villa also knew that it had delivered the appraisal in January, in response to that January 4, 2005 email to Crystal Graham and Toole. Villa knew that. They were aware that they gave the appraisal to Crystal in January. So they at least arguably now fulfilled their end of the bargain, of the agreement. We'll get them the proper underwriting information. Now Crystal Graham and Toole needs to go out and bargain. And Judge Lestine, the trial judge, missed this point when she was denying my motion for summary judgment. When she denied the motion for summary judgment, or motion for judgment notwithstanding the verdict, she said Kern, Crystal Graham and Toole, did not tell Henkel, Conrad Henkel, about this agreement with Bean. He didn't have to. Crystal Graham and Toole had an agreement with Villa that Crystal would market the property for insurance costs after receiving an appraisal and proper underwriting information. The trial court missed that. She missed the fact that the knowledge of Bean was the knowledge of Villa. Conrad Henkel was the knowledge of Villa. The knowledge of Cris Hales was the knowledge of Villa. It had a collective source of knowledge. And then the policy, the Hartford policy, is delivered to Villa. Conrad Henkel, who is now working in charge of insurance at the time, gets it and realizes, looks at it and says, this doesn't look right. It doesn't insure the existing buildings. In fact, when he was questioned by Villa's counsel, he said, What did you do after you glanced through it? Answered, called Dan Kern. What did you say to Dan Kern? Asked him if this was right. What did he say? Said, that's what we were told to do. And what did you say? Said, it looks unusual to me. I wasn't seeing the coverage for the building there, which seemed to be different from what I expected to see on the policy. Villa expected that Hartford policy to contain coverage for the existing buildings, and they knew it didn't. The response when it came back to Tristle was, that's what we were told to get by Villa. He then went to Bill Bean, who was now a former employee, who confirmed it. Bill Bean told him, that's all we will get. So Villa now knows that there is an agreement to go out to the market after they deliver the appraisal. They say they delivered the appraisal. The policy arrives. It doesn't cover the existing buildings, as they expected it to, and they're told. That's what we were told to get. Villa knew they didn't have coverage. They knew that there was an agreement that they had fulfilled on their half, and that, according to the plaintiff's argument, Tristle did not respond on their half. They knew there was a disconnect. They knew they didn't have insurance. They didn't think anything else was coming. They expected this policy to cover the existing buildings, and it didn't. And they didn't do anything. This was March of 2005, and four months later, the place burns to the ground. Four months, Villa sat there, knowing that the policy that they expected to provide coverage didn't have coverage. The fact that they didn't have coverage for that loss was the sole proximate cause of Villa. In addition to being the sole proximate cause, Tristle fulfilled its duty to Villa. Plaintiff's expert testified that if Dan Curran, Tristle Grandin Toole, didn't get the documents, the appraisal, he had a duty to inquire after January 4, 2005. Dan Curran testified that he inquired twice, at least, in the two to three weeks following the closing, which was December 28, 2004. So, according to plaintiff's own expert, Tristle discharged its duty. If he did inquire again, this is plaintiff's expert testifying, to Villa, then he discharged his duty. Again, Judge Lepstein missed that in her decision, where she said... Is that what they're talking about, the additional coverage? That that was the agreement that they all knew that, as of the closing, that this is what they were going to get. But that the agreement, then, was to get the appraisal so they could go out and get more than the builder's risk, and go out and get the rest of the insurance? And if that's... Take it in light, most faithful to Villa. But when Villa got the policy, and Villa said, I expected this policy to cover the existing buildings, based on the agreement, and they know it doesn't, then they've got a duty to do something. We've done our duty. We gave them a policy. It didn't comport with what they wanted. But they know that, and they're not expecting anything further. Because Villa, collectively, knows everything. They've got to divide it in different people, but Villa, as a whole, knows everything. And again, the trial judge said Dan Kern never told Conrad Hankel he never received the appraisal. But Dan Kern told Bill Bean, while he worked there, that he hadn't received the appraisal. That's why he was asking for it. So according to plaintiff's own expert, we discharged our duty. Villa did nothing but accept the policy that did not cover the buildings, and then sued Tristle, Graham, and Toole when the fire destroyed them, and they weren't covered. Villa was the sole proximate cause of its loss, and Tristle no longer owed Villa any duty when Villa accepted the policy as delivered. No reasonable jury could have found in favor of Villa, and the trial court erred when it denied our judgment, notwithstanding the verdict. And I request this court reverse that decision and remand the case for an entry of judgment in favor of Tristle, Graham, and Toole, or, according to my previous argument, reverse the trial court's decision to allow in the affidavit. Now, I believe I'm out of time, so I'll have to save my response to the cross-appeal until my reply. Thank you. Thank you, Mr. Martin. Mr. Feeweeger? Thank you, Your Honor. Good morning. Good morning. May it please the court, Mr. Martin, after a week-long jury trial in which many facts were presented to the jury, and in which many facts had to be weighed by the jury, the jury found in favor of my client. This panel does not sit as the trier of fact of this case. That argument you just heard was a closing argument, not a legal basis for overturning a well-founded jury verdict. In this case, the trial court did not err in denying Tristle, Graham, and Toole's motion for summary judgment. In this case, Tristle, Graham, and Toole have failed to show how Judge Lestine abused her discretion in allowing the affidavit of Letta Lanfield. In this case, Mr. Martin has failed to show, in the light most favorable to the non-movement, that there are no facts that would support this jury verdict. The court may affirm on appeal, even if the trial court abused its discretion in allowing the Letta Lanfield affidavit on other grounds. In this case, it is clear from the testimony of Dan Curran that he knew that he still had a job to do, that he still, after closing, was going to get bids for coverage of fire policies to cover the building. He admitted that at the record at page 412. It was his agreement with Bill Bean, who came to him on December 23rd and said, I need coverage for the building, and he said, wait, I can't do that fast, because of the closing happening on December 28th or 29th, 2004. Tell you what we're going to do. We're going to get the proper underwriting information after closing, and we're going to put it out on the market. And when asked what that meant, it meant he was going to get quotes. Under section 2203 of the insurance code, he had the duty to act reasonably to procure the proper insurance. He didn't do that. He didn't do anything after the closing other than have a conversation with Conrad Henkel that said, that's what you got. That's what you asked for. Well, he knew up front that that's not what he asked for. They asked for up front coverage for the building, and he said, I just can't get it done that fast, but I'll get it done for you after you close. The binder that was provided to my client showed coverage of the building, and then Mr. Curran completely dropped the ball as a reasonable insurance agent in failing to procure the proper insurance. They point to our fault all the time. They say, well, it's your fault that you didn't get the insurance. But who procures insurance? The order taker that they want their expert to be believed as or the actual licensed agent who has the duty to inquire and find out under the statute what is the reasonable needs of the client or the purchaser of insurance. He knew that they needed a policy, and let's just assume for sake of argument that Judge Lestine abused her discretion in allowing Leta Langefield's affidavit. There are still facts that create a material issue of fact that was for the jury to determine in this case whether there was a breach of duty, whether there was negligence. The problem that Tristle Graham and Toole keeps having in this case is that they want you to excuse all their negligence and just look at the negligence of the people from the villa. But they didn't plead comparative negligence. There can be more than one cause of an injury. 1501 states, Proximate cause is a cause that in the natural or ordinary course of events produces plaintiff's injury. It need not be the only cause, nor the last nor nearest cause. It is sufficient if it combines with other cause resulting in the injury. You have to then completely ignore the negligence of Dan Curran here and not follow 1501, the standard that was provided to the jury. Dan Curran knew that he didn't procure a policy that provided long-term fire protection coverage for this important building in Rock Island, Illinois. As of the time it closed, he knew that he needed underwriting information to get it out on the market. Let's assume that the appraisal never got to him. Never, ever got to him. There is nothing in the record that shows after January 4, 2005, the date of the memo from Hankel to Chris Ailes saying he wants the appraisal and I'll have Lettick get it to him. There's nothing in the record that says he ever talked to them after January 4, saying, hey, where's the appraisal? That's why the testimony of Mr. Hankel is important. Number one, Mr. Hankel says, yeah, there's no coverage. What gives? But the fact of the matter is, by that time, Bill Beam is fired. He's no longer an agent of the Villa. And you can't transfer the knowledge of Beam to Hankel in this situation. There's no memorandum showing that Beam ever told Hankel that there was the agreement to get the appraisal and the reason to get the appraisal was to get the underwriting information. Hankel asks, is that all we have? And he goes, that's what I could get. The negligence there is that he failed to tell him that I had an agreement with Beam that if he got me the underwriting information, I'd get you bids. I'd get you a quote. And Hankel's testimony after that was, if he had told me he hadn't gotten the appraisal, I would have gotten it to him or I would have had Chris Ayles get it to him. So assuming that it was error to allow in Miss Langfield's affidavit, which I disagree with given the facts of this case, at first the judge decided on summary judgment that because of the agreement up front, he was negligent. Namely, he knew that he had to do the work and then in turn didn't do it. So he knew he had the agreement and he failed to perform the agreement. Then when they turned it and said, well, wait a minute, the fact that they didn't get us the appraisal was the sole proximate cause and Judge Levstein bought that argument, which was improper, because you're still now comparing negligence in that situation. You're comparing the negligence of Hearn in failing to follow through with the negligence of Beam in failing to get him the appraisal. That's a question of fact. And Judge Levstein should have never granted summary judgment to them in the first place. So assuming that it was error to allow in the Letta Langfield affidavit, a person who's not subject to Illinois jurisdiction, a person who was on the move during this time period, a person who ended up in Des Moines, Iowa, and we did track her down finally, they haven't shown that I didn't exercise good cause or good faith in trying to secure her affidavit. Look at her affidavit as to her nomadic journey in this matter, from the time she was terminated or lost her job to the time she rehabilitated herself as a nurse and training and moving to Des Moines, and then we were able to find her. Judge Levstein found that it was reasonable that we couldn't find her in that two-year period, and they just want to argue that she abused her discretion without saying why that's not unreasonable. What were the efforts of your client to track her down? It says in the briefs that they couldn't find her. Well, we didn't have a phone number for her. We tried to use her current address. She was never home. And what ended up happening was Joe Singh ended up leaving a card at her old house and found her by virtue of nomadic journey. They come back and say, well, you could have found her by a Google search. Well, people who are moving back and forth aren't necessarily at the same address all the time, and what Google search may have happened in 2009 isn't necessarily what could have occurred in 2007 when they're saying we had the duty to produce her. But regardless of that, the fact of the matter remains, Curran had negligence in failing to do anything, no follow-up, no procuring of bids, no telling Curran in that April 2005 phone call that I couldn't get you a fire policy because you didn't get me the proper underwriting information. And their own expert admits that if that was the agreement in this situation, he did have a duty to tell the insured what was deficient, what was lacking, and his failure to do so was a breach of the standards of care. Apple Boulder, a reasonable insurance producer. Therefore, we spend our time arguing facts. We spend our time in this case arguing that the facts do not support a jury verdict when they do. If you take Judge Lestine's post-trial order and look at all those facts, there is even the light most favorable to my client, you can see that a jury reasonably can conclude that Curran was negligent and that it was a proximate cause. It may have been 1% cause of this whole thing, but because it wasn't the sole proximate cause in this case, they're liable. It would have been a better argument if he had pled comparative fault or comparative negligence. We might have been found more than 50% at fault and not been liable, and his client would not have been liable, but that isn't in the record here. If they have any negligence, a failure to perform what he did in this case, fail to ever make an effort to get a file policy, and by doing so, that caused the loss. Did we cause our loss? Partially? Probably. But that isn't the issue for you to review here. The issue here is for you to review whether the trial court erred in finding that there were no facts that could support the verdict and that this was a sole proximate cause issue. And the McCulloch versus County of LaSalle case that was decided in 1984 here sets forth the standard, and it says in that case the County of LaSalle wanted to get out of the case based on the fact that there was a claim that there was a negligence in the installation of a guardrail and serious injuries. They thought they were entitled to directed verdict on sole proximate cause due to negligence of the driver. And the court said, consistent with the authorities, we decline to hold that the defendant county's action in installing and maintaining the guardrail was a remote cause or condition of the plaintiff's injury. If under the rules of comparative negligence, the county is only remotely at fault, then the degree of fault assessed by the jury would presumably reflect this lack of culpability. The county's conduct is not so remote from the events leading to the plaintiff's injury that it can be said as a matter of law that such conduct was not a contributing legal cause. Thank you. In this case, it cannot be said that Dan Curran sitting and doing nothing from the time of closing to the time of this fire wasn't a cause. It was a cause because he admitted that he had this agreement after closing to do something, and he did nothing. And all he did was tell Mr. Hinkle that's all we could get. As to our cross appeal, we asked that the court reverse the trial court's decision on the denial of our motion for additor, which was for an additional $108,000 for demolition costs. We believe that the record reflects accurately that there was a stipulation by the parties that if the policy limits were awarded, that we would be entitled to the additional $108,000. This was at the record at page 474. We believe that the parties reached the agreement and that, therefore, that took the need for us to argue that before the jury away. And that this evidence is supported by the record as Exhibit 25 in Mr. Ailes' testimony at pages record 333 through 335. We believe that the People versus Woods Supreme Court decision in 2005 supports this. There's no need to prove stipulation of facts because that is a step that is once you stipulate, there is no need for proof and it dispenses with the need for the evidence. Once they agreed, yeah, we have that agreement. We didn't have to prove it then. Therefore, we ask that the court reverse the order denying our motion for additor and remand with directions to the trial court to amend the judgment retroactive to July 1st, 2010. Thank you. Mr. Feewood, I have just a factual question. Okay. Is there a history of dealing between these parties? There's a history of dealing not between Villa E.L.C. and Trissel Gravenstool. There was a history of dealing between Mr. Bean, the insurance requester. For Watts Trucking. For Watts Trucking Company. And so when Bean came to him and had already previously placed numerous insurance policy orders for Watts, they had a comfort level. They had a level of understanding. And basically, he said, I need insurance for the Villa. Can you get that for me? He said, no way, not that fast, but we have this agreement. Thank you. Mr. Martin. What Mr. Feeweeger and what Judge Lestine are missing is that Trissel Gravenstool did tell Villa. Villa is the plaintiff. Villa is the entity. Trissel Gravenstool told Villa that they had not received the appraisal information. Dan Curran testified. So the first conversation you asked for it, and then sometime after the closing, did you ask for it? Sometime during the next two or three weeks, I asked for it a number of times. And you believe that was two times? Minimum of two times. That's the record, page 438 and 439. So after January 4th of 2005, Trissel Gravenstool did ask Villa for the appraisal and didn't get it. So Villa knew when the policy was delivered. Villa knew that the appraisal had not been received. They may have delivered it, but it had not been received. Trissel Gravenstool did not have cognizance of it. To follow Mr. Feeweeger's theory here, when Dan Curran says that's all we could get, if an agent said, if you do this, then I'll get you insurance. If you can't get it, according to Mr. Feeweeger's theory, you're liable. Even if you tell them I can't get it. It has to be able to be cut off someplace. The duty has to be cut off when you tell them that's all we could get. And then, again, Plaintiff is harping on Conrad Henkel didn't know of this agreement. It doesn't matter that Conrad Henkel didn't know of the agreement. Villa knew of the agreement, that if the appraisal was received, Dan Curran would go out and try to get policy for it. So it was an if, then. And Villa knew they had not, according to Dan Curran, done the if part. And just to follow up on your question, Justice McQuaid, what efforts were made to find Leta Langfeld? Mr. Feeweeger saying she was nomadic, but she was a former employee of the Plaintiff. They had her social security number. You didn't hear anything about a skip trace. You didn't hear anything about an internet search. And she wasn't nomadic. Her affidavit says as of July 11, 2007, which is two months before I filed my first motion for summary judgment, she was a nurse in Des Moines, Iowa. She was no longer a nomadic. And up until the time of her affidavit, that's where she lived, in Des Moines, Iowa. There was no nomadic activity by her whatsoever. Now, with respect to the cross appeal, with respect to adequate, the only stipulation that I made at the time of trial was that the Hartford Builders Risk Policy, the policy that was produced, the only policy that was in the courtroom, would have provided coverage for the cleanup costs in excess of the stated policy limits of $2.4 million. And in response, Mr. Feeweeger said, so the jury could give an additional $108,000 over the $2.4 million? And I said, yeah, they could. It's not automatic. They could. You still have to prove your case. This stipulation occurred during the middle of plaintiff's case in chief. Their expert still had to go on the stand. He hadn't testified yet. This stipulation was on the morning of June 23. Plaintiffs still had to prove that the policy that we failed to produce would have provided coverage for the cleanup costs and in excess of the stated policy limits. Now, certainly the fact that the Hartford policy we did produce, in my reading, would provide coverage over and above that, that would be good evidence for them. But I didn't agree that a property policy that covered the existing buildings would provide that coverage. I didn't agree that plaintiffs requested a policy that would provide that coverage. Would that policy that we didn't produce, would it have cost more? I don't know. Would plaintiffs have wanted it if it cost more? No evidence. Plaintiffs' only testimony was, I wanted insurance for $2.4 million because that's what I paid for. That was the only testimony in the case by Chris Sales as to the amount of the coverage. What would have been the cleanup limits of this policy? I don't know. Would they have been in excess of the stated coverage limits? I don't know. I was stipulating that if plaintiffs could prove that was the coverage that we failed to get, then the verdict could be as high as 2.508. And at that time, I was arguing against plaintiffs' architectural expert being able to testify that the cost to redo the building, to renovate it, to replace it, was in the range of $8 million. There was no evidence that there was ever a policy that was going to cover that. So that was the context of that argument. All plaintiffs proved in this case was that Dillon wanted $2.4 million in coverage. The trial court was correct in denying plaintiffs' motion for editor. Editor is only appropriate when the jury fails to consider proven and proximately caused damages. The plaintiff failed to prove and provide the jury any evidence that any negligence by Tristle proximately caused them not to have a property policy that would have covered the existing buildings and the providers for cleanup costs in excess of the stated policy limits. And plaintiffs' motion for editor was properly denied. Thank you. Any other questions? Thank you, Mr. Martin. Thank you. Mr. Feewaker? Mr. Martin stated when we were discussing this issue, and I think we would even stipulate that the 106 or 108 of cleanup that you let in under the McAdams would, is the way I read the policy, will stipulate to it, goes above the $2.4 million limits. Based on that, it's my understanding that he was agreeing that if the proper policy had been procured, it would have also covered the demolition costs that were undisputed in the record. Mr. Ailes testified, as I cited to you at pages 333 through 335 in the record, that immediately, because of the damage to this property, they had to start securing it and incurring demolition costs, of which we attempted to put in more than proof of the 108. They objected to undisclosed exhibits, and so we ended up being limited under Exhibit 25 to the $108,000, the McAdams demolition bills that were paid bills. The testimony from Mr. Ailes was that he paid those. A paid bill is presumed under the law to be reasonable. Therefore, we believe that the evidence was sufficient, based on the record, to grant the editor, given these facts and given the stipulation that we reached. Thank you. Are there any other questions? Thank you. We thank both of you for your argument this morning. We'll take the matter under advisement.